### Sales v. Martin.

(Decided February 2, 1917.)

## Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

1. Appeal and Error—Bills and Notes—Accommodation Paper—Evidence—Sufficiency.—In an action on a promissory note alleged to have been executed by the defendant for the accommodation of plaintiff, evidence on the question of accommodation examined, and held sufficient to take the case to the jury and sustain the verdict.

2. Appeal and Error—Instructions to Jury.—Where an instruction defining a technical term is correct as far as it goes, a party who fails to offer an instruction giving a more explicit or comprehensive definition cannot complain of the given instruction.

WM. MARSHALL BULLITT, CLARENCE C. SMITH and KEITH L. BULLITT for appellant.

J. W. GARRISON for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

On July 15th, 1913, A. G. Martin, a resident of Louisville, Kentucky, executed to his brother, W. C. Martin, two notes for $2,500.00 each, payable three and four months after date, respectively. The notes were executed and sent to W. C. Martin, who lived at Detroit, Michigan. Martin endorsed them and mailed them to the S. & M. Motor Company at New York. Edward E. Strobel endorsed the notes and presented them to the company's bank for discount. When the first of the two notes fell due it was not paid, and A. G. Martin executed a new note for the same amount to the order of W. C. Martin. This note was accepted by the bank with Strobel's personal endorsement in renewal of the old note. When the second of the two original notes fell due, Strobel paid $1,000.00 to the bank and Martin

executed a note for $1,500.00, which the bank accepted with Strobel's endorsement in renewal of the balance of $1,500.00 due on the second note. Strobel, by reason of his personal endorsements, was compelled to take up the notes and pay the bank the entire $5,000.00. He then assigned the notes to Grover Sales, who instituted this suit against the maker, A. G. Martin. A trial before a jury resulted in a verdict and judgment for Martin. Sales appeals.

A. G. Martin, the maker of the two notes, defended on the ground that the two notes were executed for the joint accommodation, and upon the joint request, of W. C. Martin and Edward E. Strobel. Counsel for appellant concede that, if this be true, a finding in favor of the defendant was proper, but insist that the evidence on this proposition was not sufficient to take the case to the jury.

Strobel's evidence is to the effect that he and W. C. Martin had subscribed for certain stock in the S. & M. Motor Company. The amount of W. C. Martin's subscription was $5,000.00. For this sum W. C. Martin gave the company his note, payable June 26th, 1913. W. C. Martin obtained the two notes sued on from his brother, A. C. Martin. Strobel received them three or four days after they were dated. Before the Commercial Trust Company, of New York, would discount the notes, it required Strobel's personal endorsement. The proceeds of the two notes were placed to the credit of the S. & M. Motor Company. Strobel received no part of the proceeds himself, but endorsed the notes for the accommodation of the S. & M. Motor Company. When the first note became due it was renewed and accepted by the bank, which again required Strobel's personal endorsement. When the second note became due, Strobel paid the bank $1,000.00. The renewal note, which was executed by A. G. Martin to W. C. Martin for the balance of $1,500.00, was accepted by the bank with Strobel's personal endorsement. Strobel further says that he did not request A. G. Martin to execute either of the two notes and had no conversation or correspondence of any kind with him in regard to the two notes. The notes were executed solely for the accommodation of W. C. Martin to enable the latter to meet his obligation to the S. & M. Motor Company.

A. G. Martin, testified, in substance, that he was the brother of W. C. Martin and that he knew Edward E. Strobel fairly well. He also knew that Strobel and his brother had gone into the automobile business in New York. At that time his brother, W. C. Martin, was a bankrupt, while Strobel and his people were wealthy. As to the circumstances under which the two notes were executed, A. G. Martin testified as follows:

"Q. Now, just tell, if you please, in your own way, what correspondence you had with Mr. Strobel in reference to the execution of these two notes, if any—in the first place, I will ask you where is the correspondence between you and Mr. Strobel? A. I haven't a single letter. Q. What has become of them? A. Why, I had a lot of letters at home, and my mother house-cleaned, and burned up a batch of stuff like that I had. Q. Have you sought for them—tried to find them? A. Yes, sir; I have looked for them and did not find a single letter. Q. Now, will you tell the jury, please, what passed between you and Mr. Strobel before these notes were executed, with reference to these two particular notes? A. Well, as I started to say, the first note I executed was for—— Mr. Bullitt: We object to that now. The witness: I have to tell that to lead up to the other two. Mr. Bullitt: I don't know anything about that, but I object to it on general principles. The Court: Let's see how it goes, and I will see whether it is competent or not. (Counsel for plaintiff excepted). A. The first note I executed was for a thousand dollars, and I mailed the note direct to Mr. Strobel. My bookkeeper got the address on the envelope wrong, and about two weeks afterwards the note came back, or rather, the letter, and a short time after that I had a letter from Mr. Strobel asking me—— Mr. Bullitt: Just a minute, if your Honor pleases; I object now to testimony about the thousand dollar note and move that it be stricken out. The Court: Yes, that has no bearing on the question at issue; just eliminate that from your minds. (Counsel for defendant excepted). A. I had a letter and a wire from my brother asking me for the note; first for a $2,500 note, and the following day—— Mr. Bullitt: Just a minute; I object unless he produces that or explains that that letter from his brother has been destroyed. A. I have none of that correspondence. I testified to that. The Court: He said that. (Counsel for

plaintiff excepted). A. I did not make out that note that afternoon. It wás late, and the following day I had a wire from my brother asking me to make that $2,500 more, making two $2,500 notes, and I executed those notes and sent them direct to him, made payable to W. C. Martin. Q. What correspondence, if any, did you have in reference to that with Mr. Strobel? A. Well, I had so much correspondence about it that it was hard to keep up with it. I had a bunch of letters, and I would like to have them now. Q. State whether or not you were requested to execute these notes for his accommodation; not only those two notes, but subsequent notes? (Objected to by counsel for plaintiff). The Court: Confine yourself to these two particular notes. Q. The judge has ruled on that; confine yourself to these two. A. Yes, sir. Q. Mr. Strobel did not say anything to you about wanting these notes to take up Walter's notes? A. No, sir. (Objected to by counsel for plaintiff). The Court: He can tell anything that the letters contained bearing on these two particular notes. A. Well, I had some letters from Mr. Strobel and wires. I had so much stuff it is hard to remember exactly what it was now, except that it was all asking me to endorse, or give my notes, and asking me if I could not discount some of the paper here in my bank, not only my paper, but asked me for my firm's paper, that they could discount that in the Commercial Bank & Trust Company because we had an account at the Commercial Bank & Trust Company. Mr. Bullitt: I object to that, and move that the jury be instructed. The Court: I think the jury understands that we are hearing testimony only on the two particular notes that are sued on. Q. Now, in reference to the correspondence concerning which you have just testified, did that apply to these two notes? Mr. Bullitt: I object to that, if your Honor pleases. The Court: Mr. Martin can say whether or not—— A. I was asked for the notes, if I would not give them, by Mr. Strobel, and by my brother, not only by letter, but by wire. I don't know that Mr. Strobel wired me about sending the notes; the two $2,500 notes you are talking about. Q. State whether or not it was because of this request by Mr. Strobel and also your brother that you executed these two notes? A. It is. Q. Was anything said in this correspondence between you and Mr. Strobel about your executing these two $2,500 notes to take

up a $5,000 note of Walter's that was past due? A. I did not know what interest he had in the corporation. Q. Did you know that he had executed a $5,000 note? A. No, sir; I did not. When he was here he showed me a telegram from Mr. Strobel's brother where he said they would furnish all the money. (Objected to by counsel for plaintiff; objection sustained, to which the defendant by counsel excepted). Q. Did you ever take up the $5,000 note? A. I did not. Q. Have you ever seen the $5,000 note? A. I did not know anything about it until this suit came up. Q. Were you benefited in any way by signing these notes? (Objected to by counsel for plaintiff). Q. Any consideration at all for signing them? (Objected to by counsel for plaintiff; objection overruled, to which the plaintiff by counsel excepted). A. Not one penny. (Objected to by counsel for plaintiff; objection overruled, to which plaintiff by counsel excepted). A. Mere accommodation.''

On cross-examination he stated that he had had a wire and a letter from Mr. Strobel before that time. That is the reason he gave the notes.

W. C. Martin testified that he and Mr. Strobel were engaged in the business of manufacturing and selling automobiles under the name of S. & M. Motor Company, Incorporated. Mr. Strobel was the president and treasurer, while witness was the secretary. The business continued a little over a year. The company was in financial straits and Strobel asked him if he could not get Aaron to give them some paper which they could discount in New York. The $5,000.00 note which he executed to the company was not taken up by the two notes executed by his brother, Aaron. After stating that he and Strobel talked over the question of getting money, he testified as follows:

''Q. Did Strobel ask you to try to get this endorsement from Aaron Martin? A. Yes, sir. Q. To get this paper from him, A. Certainly. Q. Did that occur before these two notes were signed, that is, that request of Strobel to you? A. Yes, sir.''

He further testified:

''Q. And it is a fact, is it not, that your brother, Aaron, signed these two notes, sent them to you in Detroit in response to your request written to him in Louisville to please sign $5,000 worth of notes and send to him; that is true, is it not? A. Yes, sir; that is true.

Q. That is how he came to send them, was at your request, that is right? A. I think at the request of Mr. Strobel, too, as I remember now. I think Mr. Strobel— I had a letter from Mr. Strobel asking me to hurry up the notes."

It is argued for appellant that the evidence, considered as a whole, shows that the notes sued on were executed solely upon the request and for the accommodation of W. C. Martin. An examination, however, of the foregoing statement of the evidence will show that Aaron G. Martin testified unequivocally to the fact that he was requested to execute the two notes sued on for the accommodation of Strobel. He further says that he was asked if he would not give the notes both by Mr. Strobel and his brother, and that it was because of the request by Mr. Strobel and by his brother that he executed the two notes. It further appears from the testimony of W. C. Martin that Strobel asked him to get the particular paper from his brother, and that this request was made before the two notes were signed. He also says that he had a letter from Mr. Strobel, asking him to hurry up the notes. Under these circumstances, we conclude that it was for the jury to say whether or not the notes sued on were executed for the joint accommodation, and upon the joint request, of Strobel and W. C. Martin.

The court instructed the jury, in substance, to find for the plaintiff, unless they believed from the evidence that the defendant, Martin, executed the notes mentioned in the evidence for the accommodation either of Strobel or of Strobel and his brother, W. C. Martin, jointly, in which event they should find for the defendant. By another instruction, "accommodation" was defined as "the lending of his credit by one to another who gives no consideration therefor." The point is made that the instruction defining "accommodation" did not sufficiently explain the full meaning of the word and the nature of the rights and obligations of the parties to the instrument. In this connection it is suggested that the jury may have concluded that the notes were executed for the accommodation of Strobel, if, as a matter of fact, he received some indirect benefit or advantage from the execution of the notes. Clearly, the instruction complained of is correct as far as it goes.

If appellant desired a more comprehensive definition of the word "accommodation," he should have offered an instruction containing such a definition. Not having offered such an instruction, he cannot complain of the fact that the given instruction was not as explicit or comprehensive as it should have been. Hobson, Blain & Caldwell on "Instructions to Juries," page 23; Ventura Hotel Co. v. Pabst Brewing Co., 128 S. W. 292; Loughridge v. Ball, 118 S. W. 321; Cincinnati, N. O. & T. P. Ry. Co. v. Martin, 146 Ky. 260, 142 S. W. 410.

Judgment affirmed.